## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ARESTY INTERNATIONAL LAW OFFICES, P.C. | ) ) ) |
|  | ) |
| Plaintiff, | ) ) |
| v. | ) CASE NO. 04-12532 RWZ |
|  | ) ) |
| HARTFORD FIRE INSURANCE COMPANY | ) ) |
| Defendant. | ) ) |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL DISCOVERY PURSUANT TO FED.R.CIV.P. 37

In accordance with Rule 37 of the Federal Rules of Civil Procedure, plaintiff Aresty International Law Offices, P.C. ("Aresty"), seeks to compel further discovery with respect to certain inadvertently disclosed documents by the defendant Hartford Fire Insurance Company ("Hartford"). In particular, Aresty seeks to compel (1) the Hartford to answer questions posed to one of its deponents concerning the content of the inadvertently disclosed documents and (2) the production of all other documents in the Hartford's possession, custody, or control relating to the subject matter of the inadvertently disclosed documents. Furthermore, Aresty seeks an order allowing Aresty to resume the deposition of one of the Hartford's witnesses, which was suspended pending the resolution of the status of the inadvertently disclosed documents. As shown more fully below, the Hartford should be deemed to have waived the attorney-client privilege with respect to the subject matter of the disclosed documents for failing to take adequate steps to guard against their inadvertent disclosure.

## **BACKGROUND**

Aresty commenced the underlying action against the Hartford on December 2, 2004 for unfair settlement practices in the Hartford's investigation, adjustment, and denial of Aresty's claims for coverage under the parties' business insurance policy. Aresty's claims for coverage arose from substantial water damage to Aresty's business premises on April 19, 2003 caused by flooding. In connection with this damage, Aresty presented claims for business income, extra expense, business personal property, valuable papers, personal effects, and law library.

On December 2, 2003, after a difficult seven-month adjustment process that produced only nominal payments on Aresty's coverage claims, the Hartford denied Aresty's claims in full. Through its counsel at the time, Lawrence Dugan of Morrison Mahoney LLP, the Hartford took the position that although it did not necessarily agree with the amount of loss claimed by Aresty, the Hartford would be denying the entirety of Aresty's claims on the basis of purported forged and fraudulent invoices submitted by Aresty in support of its extra expense claim. Aresty had submitted the invoices at the request of Hartford for the sole and transparent purpose of recording the time spent by Aresty employees in the clean up and restoration of Aresty's business premises.

Shortly after filing its complaint, Aresty requested from the Hartford its claims file and related documents concerning the Hartford's investigation, adjustment, and denial of Aresty's coverage claims. On April 1, 2005, Hartford's counsel, Michael Aylward of Morrison Mahoney LLP, made two productions in response to Aresty's requests. In the first production, Mr. Aylward represented by cover letter that he was enclosing "Hartford's claims file." The production encompassed several hundred unmarked and unnumbered documents, to which Aresty applied its own bate-stamps. In the second production, Mr. Aylward explained that he

2

was enclosing "an additional stack of documents that were inadvertently omitted from the materials that we sent to you earlier today." This production encompassed several hundred more unmarked and unnumbered documents, to which Aresty again applied its own bate-stamps. The total production overseen by Mr. Aylward consisted of less than seven hundred pages of documents. Mr. Aylward did not provide a privilege log in connection with either production.

Upon inspection of the documents, Aresty's counsel immediately discovered that several documents appeared to contain attorney-client communications between Mr. Aylward's law partner, Attorney Dugan, and John Perry, the Hartford claims adjuster assigned to investigate and adjust Aresty's coverage claims. In particular, Aresty's counsel identified and segregated the following six documents, which, with the exception of the last, concerned and were contemporaneous with the Hartford's denial of Aresty's claims: [1]

1. HART 0529-0530: letter from Attorney Dugan to Mr. Perry concerning the Hartford's December 2 denial letter, dated December 3, 2003;

2. HART 0532: letter from Attorney Dugan to Mr. Perry concerning the initiation of settlement discussions with Aresty, dated December 15, 2003;

3. HART 0625: fax over letter from Attorney Dugan to Mr. Perry concerning denial letter, dated December 3, 2003;

4. HART 0628: fax cover letter from Mr. Perry to Attorney Dugan authorizing the denial letter, dated December 1, 2003;

5. HART 630: fax cover letter from Attorney Dugan to Mr. Perry contents unknown, dated December 16, 2003;

6. HART 0643-0644: invoice from Attorney Dugan to Mr. Perry for services rendered from September 22 to September 30, 2003, dated October 29, 2003.[2]

---

[1] Aresty subsequently discovered a seventh inadvertently disclosed document, HART 0616, from Claire Banks of Carey & Company, who was retained by the Hartford to provide forensic accounting services, to Attorney Dugan and Mr. Perry, dated November 13, 2003.

[2] These six inadvertently disclosed documents, together with the three additional inadvertently disclosed documents identified herein, are attached as Exhibit A to the Memorandum.

3

Mr. Aylward did not immediately request the return of these documents. Indeed, Mr. Aylward did not immediately appreciate that he had disclosed potential attorney-client communications. Rather, on April 4, Mr. Aylward wrote Aresty's counsel that, "[b]y the way, I note that the materials that we sent you last Friday inadvertently included a Morrison Mahoney invoice. Please either return this document or destroy it." See Exhibit B. Mr. Aylward did not come to learn of the extent of the inadvertent disclosure until Aresty's counsel prepared and delivered to Mr. Aylward a spreadsheet describing the six documents. See Exhibit C. Aresty's counsel explained that it would retain these documents pending a conference with Mr. Aylward at the deposition of Mr. Perry scheduled for April 5. Aresty's counsel further requested a privilege log from Mr. Aylward, which Mr. Aylward had failed to provide despite several previous requests from Aresty's counsel.

Mr. Aylward responded to Aresty's request for a privilege log on April 4 by representing that the only items he intentionally withheld from the April 1 production were several invoices from Morrison Mahoney to Hartford. Apparently unfamiliar with the other documents described in Aresty's spreadsheet, Mr. Aylward advised that Aresty's counsel return the documents so that he could review them and include them in a privilege log if he determined that they were in fact privileged. Further responding to Aresty's request for a privilege log, Mr. Aylward sent an additional communication representing that "we didn't send you a privilege log earlier as none was necessary since we didn't withhold any documents." See Exhibit D. Once again, Mr. Aylward explained that he would reconsider the need for a privilege log if Aresty returned the documents for his review.

Aresty's counsel did not return the inadvertently disclosed documents. Instead, counsel carefully segregated the documents from the rest of the production pending the conference with

4

Mr. Aylward. Later that night on April 4, Mr. Aylward delivered to Aresty's counsel a privilege log.[3] See Exhibit E. In a cover letter, Mr. Aylward explained: "there are several privileged documents that were inadvertently included in the redwells that we produced to you on Friday. I am attaching a privilege log identifying these materials and the basis on which we believe that they are inappropriate for discovery." See id. The privilege log contained four entries identifying Documents 1, 2, 4, and 6 described above. Its descriptions incorporated the descriptions contained in Aresty's spreadsheet. Further, the privilege log did not identify any documents not already identified by Aresty's spreadsheet.[4]

At the April 5 deposition, Aresty's counsel advised Mr. Aylward that he intended to depose Mr. Perry as to the contents of HART 0529-30, the inadvertently disclosed letter between Attorney Dugan and Mr. Perry concerning the Hartford's denial of Aresty's claims. Mr. Aylward explained that he would instruct Mr. Perry not to answer any questions concerning HART 0529-30 on grounds that it was privileged. When Aresty's counsel posed questions to Mr. Perry concerning the disputed document, Mr. Aylward instructed Mr. Perry not to answer. Mr. Aylward again claimed that the document was privileged. See Exhibit G, 107(17)-110. In light of this instruction, Aresty's counsel suspended Mr. Perry's deposition to allow the parties to resolve the appropriateness of Mr. Aylward's privilege claim. See id., 156(15)-157.

On June 10, 2005, Mr. Aylward produced additional documents in response to Aresty's request for the Hartford's home office file. Similar to the April 1 production, Mr. Aylward did

---

[3] Mr. Aylward's claim to have asserted the attorney-client privilege by providing the privilege log on April 4 is misleading. It overstates both the immediacy and initiative with which Mr. Aylward acted to preserve the privilege. Earlier on April 4, Aresty's counsel wrote to Mr. Aylward: "Following your email today regarding the MMM [Morrison Mahoney] invoice, attached please find a listing of documents that you have produced that appear to contain attorney-client communications." See Exhibit F. The attached spreadsheet identified the relevant bates range, date, author, recipient, document type, and content of each document. Mr. Aylward then recycled this spreadsheet into the privilege log which he emailed back to Aresty's counsel four hours later. The privilege log contained no information that was not already brought to Mr. Aylward's attention by the spreadsheet.

[4] The privilege log also did not identify the seventh inadvertently disclosed document subsequently discovered by Aresty and not contained in Aresty's spreadsheet.

5

not create a privilege log or otherwise identify privileged documents. Amongst the documents produced were three documents containing attorney-client communications. The second set of inadvertently disclosed documents included:

7.    HART 0698:  fax cover letter from Attorney Dugan to Mr. Perry enclosing the examinations under oath conducted by Attorney Dugan of Aresty employees and a paralegal, dated December 12, 2003;

8.    HART 0724:  letter from a Hartford paralegal to Mr. Aylward enclosing a copy of the Hartford home office file, dated April 18, 2005;

9.    HART 0725:  letter from Attorney Dugan to Sam Rizzitelli, home officer manager and supervisor of John Perry, enclosing the examinations under oath conducted by Attorney Dugan of Aresty employees and a paralegal, dated December 30, 2003.

Also similar to the April 1 production, Mr. Aylward did not request the return of these documents, nor did he even appear aware of their inadvertent disclosure.

Finally, on June 30, 2005, Aresty's counsel deposed Mr. Rizzitelli, the Hartford manager who had supervised Mr. Perry during the course of the adjustment of Aresty's coverage claims and who had played a role in authorizing the denial. Aresty's counsel asked Mr. Rizzitelli about the contents of HART 0532, one of the inadvertently disclosed letters from Attorney Dugan to Mr. Perry concerning the denial of Aresty's claims. The only objection that Mr. Aylward raised to the use of HART 0532 came three questions into the line of inquiry, in which Mr. Aylward objected to the mischaracterization of the document. Mr. Aylward never objected to the use of the document on privilege grounds, and indeed allowed Aresty's counsel to quote from the document and pose questions on its express content. See Exhibit H, 73(11)-74.

Aresty now claims that Mr. Aylward's multiple and successive inadvertent disclosures— in which he first disclaimed making disclosures of attorney-client communications, then sought to retrofit such communications with the attorney-client privilege, and then persisted in making

6

disclosures of attorney-client communications—waives the attorney-client privilege with respect
to the actually disclosed documents and to all other documents relating to the same subject
matter.

## ARGUMENT

### I.    The Hartford Waived the Attorney-Client Privilege Through Counsel's Inadvertent
Disclcsures

The party claiming the protection of the attorney-client privilege bears the burden of
demonstrating by a preponderance of the evidence "not only that the privilege applies, but also
that it has not been waived." See Amgen Inc. v. Hoechst Marion Roussel, Inc., 190 F.R.D. 287,
289 (D.Mass. 2000) (Young, C.J.); see also State ex rel. Allstate Ins. Co. v. Gaughan, 508 S.E.2d
75, 95-96 (W.Va. 1998) ("We further hold that the party inadvertently disclosing attorney-client
communication bears the burden of showing by a preponderance of the evidence that the
communication should retain its privileged status."). The Hartford cannot meet its burden of
showing that the privilege was not waived through counsel's inadvertent disclosures.[5]

The law in this jurisdiction is clear that inadvertent disclosures waive the attorney-client
privilege. See Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 883-84 (1st
Cir. 1995) ("It is apodictic that inadvertent disclosures may work a waiver of the attorney-client
privilege."); Amgen, 190 F.R.D. at 291. Courts will find inadvertent disclosures where parties
have failed tc take reasonable steps to protect the privilege. See Amgen, 190 F.R.D. at 291; VLT
Corp. v. Unitrode Corp., 194 F.R.D. 8, 11 (D.Mass. 2000). This rule holds parties accountable

---

[5] The Hartford's failure to provide a timely and complete privilege log in violation of the Federal Rules may provide
an independent basis for finding a waiver of the attorney client privilege. See Fed.R.Civ.P. 26(b)(5) and Advisory
Committee Notes ("To withhold materials without such notice is contrary to the rule…and may be viewed as a
waiver of the privilege or document."); see also Strougo v. Bea Associates, 199 F.R.D. 515, 521 (S.D.N.Y. 2001)
("The failure to provide a timely privilege log or to describe the documents in conformity with the Local Rules may
result in a waiver of the privilege."); Skinner v. O'Mara, 2000 U.S.Dist.LEXIS 10922 (D.N.H. 2000) ("If the
defendants intend to assert a federal common law privilege, they must submit a privilege log and make an express
claim for such privilege.").

"for failing to make a reasonable effort to protect privileges that were created for their own benefit." Fleet National Bank v. Tonneson & Co., 150 F.R.D. 10, fn. 10 (D.Mass. 1993).

The Hartford's inadvertent disclosure is indisputable. Not only did the Hartford fail to take reasonable measures to protect the disputed documents from disclosure; it failed to take any protective measures at all. Mr. Aylward's production bears absolutely no indication that he did anything more than reach for the Hartford's files with one hand and deliver them to Aresty with the other. They came unmarked by any bates numbering; they came without any deletions or redactions; they came without a privilege log; and they came hastily produced, as Mr. Aylward acknowledged that over two hundred documents had been "inadvertently omitted" from April 1's earlier production. Indeed, Mr. Aylward's cover letter to the second production (HART 0528) rests directly on top of disputed HART 0529—the letter from Attorney Dugan to Mr. Perry that Mr. Aylward now claims is privileged. Even the physical process of appending the cover letter to the production would have disclosed the attorney-client communication, which bore the same letterhead as Mr. Aylward's cover letter, clearly identified Attorney Dugan, Mr. Aylward's law partner, as its author, and addressed John Perry, "General Adjuster, the Hartford." HART 0529, in turn, is followed exactly one document later by another attorney-client communication between Mr. Aylward's law partner and Mr. Perry, written on the same Morrison Mahoney letter head, signed by Attorney Dugan, and addressed to Mr. Perry. Had Mr. Aylward simply looked through the first three documents produced in the second production, he would have discovered not one, but two, communications from his own colleague written on his own firm's stationary to his client. This utter failure to screen the Hartford's documents as they were produced suggests more than inadvertent disclosure. A "court could even infer from a party's gross negligence or

8

complete indifference that, at the time the disclosure was made, the party actually did intend to waive the privilege." Fleet National Bank, 150 F.R.D. at 16.

Mr. Aylward's response to the discovery of the disclosure proves equally telling. Failing to appreciate the extent of the disclosure, Mr. Aylward initially requested the return of a single "inadvertently included" invoice from Morrison Mahoney. By comparison, Aresty's counsel had immediately identified and recorded six inadvertently disclosed documents on the day of production. When Aresty's counsel informed Mr. Aylward of the extent of the inadvertent disclosure, Mr. Aylward responded that he had no way of knowing about or identifying the disclosed documents unless Aresty returned them for his review. Even after Mr. Aylward created a privilege log, he made no concerted effort to reclaim the disputed documents. The burden was on him to establish their privileged status. Yet, apparently satisfied that post-disclosure incantations of the privilege are enough, Mr. Aylward took no legal action to assert the privilege other than to invoke it once during Mr. Perry's deposition. Mr. Aylward then proceeded to make three subsequent disclosures of attorney-client communications—for which no privilege log or request for return has been made—and permitted inquiry by deposition on the express contents of HART 0529. Mr. Aylward's continued laxness puts him beyond the point of claiming that the disclosures were the harmless result of simple inadvertence. His "passivity is incompatible with [the] obligation to 'jealously' protect any privilege in the documents." Bowles v. National Assoc. of Home Builders, 224 F.R.D. 246, 257 (D.D.C. 2004).

Even if Mr. Aylward's untimely efforts count for something, they clearly fail to satisfy the high burden of reasonableness imposed by courts in this jurisdiction on efforts to protect attorney-client communications from inadvertent disclosure. Inadvertent disclosures do not waive the attorney-client privilege only where the "totality of the circumstances" demonstrates

that reasonable measures were taken to protect the privilege. See Amgen, 190 F.R.D. at 291. In Amgen, Chief Justice Young identified five factors to guide courts in making this determination: (1) the reasonableness of the precautions taken to prevent inadvertent disclosures, (2) the amount of time it took the producing party to recognize its error, (3) the scope of the production, (4) the extent of the inadvertent disclosure, and (5) the overriding interest of fairness and justice. See id. Mr. Aylward's conduct fails under each of these factors.

As stated above, the Court will have a hard time applying the first factor to Mr. Aylward's precautions because he took none. There is simply no evidence that Mr. Aylward scrutinized—let alone processed and filtered—the Hartford's documents before producing them to Aresty. Merely looking at the Morrison Mahoney letterhead resting on top of the second April 1 production would have alerted Mr. Aylward to the potential disclosure of attorney-client communications. In Amgen, the disclosing party at least paid the documents enough attention to segregate privileged documents from responsive, non-privileged ones. Even this, however, failed to provide evidence of "extensive precautions to prevent the disclosure of privileged information." Id. Chief Justice Young dismissed this conduct as merely describing "the act of document production and falls short of demonstrating precautions intended to prevent inadvertent disclosures." Id. Mr. Aylward's simply serving as a clearinghouse for the Hartford's documents clearly falls within the mechanical act of document production that falls well short of demonstrating reasonable precautions to prevent inadvertent disclosures.[6]

---

[6] In this way, Mr. Aylward's handling of the Hartford's documents more closely approximates the deficient discovery conduct described in Texaco:

> "You people told them, here is a room full of papers, you can take a look at them. They looked at them, they found them and then when you discovered that they had seen them and that they wanted copies of those, then you came running here seeking an order."
> See Texaco, 60 F.3d at 883 fn. 7.

Mr. Aylward's conduct is even less excusable given the modest size of the document production. This was not a case where Mr. Aylward had to sift through thousands upon thousands of documents with an assorted team of lawyers and paralegals before production could be made. Cf. Amgen, 190 F.R.D. at 288 (two law firms reviewing over 200,000 pages of documents). Nor was it a case where simply one or two documents fell through the cracks. Cf. VLT Corp., 194 F.R.D. at 10 (two documents out of 25,000 pages of documents inadvertently produced); Fleet National Bank, 150 F.R.D. at 16 (one document out of 50,000 documents inadvertently disclosed). The Hartford produced less than 750 pages of documents. Among those documents, at least ten bore the obvious indicia of attorney-client communications. It was entirely feasible for Mr. Aylward to look through the documents page by page to segregate the obvious attorney-client communications. Even precautionary measures this basic would have prevented the inadvertent disclosures. See Amgen, 190 F.R.D. at 292 ("The ease with which this disclosure could have been prevented informs the Court's ruling that [the disclosing party's] precautions were not reasonable.").

Applying the second factor, what is more dispositive than the amount of time it took Mr. Aylward to discover the inadvertent disclosure was the manner in which the discovery was made—or, more to the point, the manner in which the discovery was brought to him. Mr. Aylward produced the documents on April 1. On April 4, he requested the return of a single invoice. It was only when Aresty's counsel delivered Mr. Aylward a copy of the spreadsheet that Mr. Aylward came to appreciate the extent of the inadvertent disclosure. See Amgen, 190 F.R.D. at 292 ("it took [the disclosing party] five days to recognize its error and then only after counsel for [plaintiff] drew attention to the privileged documents."); compare Fleet National Bank, 150 F.R.D. at 16 (recognizing inadvertent disclosure of one out of 50,000 documents

within a few days of occurrence and before copy was sent to the other side). Not only did Mr. Aylward not actively detect the disclosure, he failed to take any concerted steps to remedy it once it was brought to his attention. Mr. Aylward has not sought a court ruling to protect any privilege in the disputed documents. In spite of his obligation to "jealously" guard the attorney-client privilege, Mr. Aylward has left this matter outstanding, perhaps hoping that, if it is ignored long enough, it will simply disappear. See Bowles, 224 F.R.D. at 257. This tactic fails as an adequate response to a known inadvertent disclosure. See id. at 259 (finding inadvertent disclosure where disclosing party "failed to take any discernible steps to protect the confidentiality of the documents at the outset, and then failed for more than a year to take any legal measures to preserve its privileges in the documents once it discovered that they were in the open.").

Applying the third and fourth factors together, the extent of Mr. Aylward's inadvertent disclosure, measured against the narrow scope of the overall production, demonstrates just how little Mr. Aylward did to protect the disputed documents from disclosure. Mr. Aylward made three document productions. No production exceeded 400 pages of documents. Yet from those productions came at least ten inadvertently disclosed documents. Mr. Aylward cannot protest that these documents simply slipped through the net. Aresty's counsel was able to identify the original six inadvertently disclosed documents on the very day they were produced. Three days later, Aresty's counsel had segregated, identified, and described them, and forwarded the results of this effort to Mr. Aylward. This task was neither difficult nor sophisticated. The attorney-client communications were not hidden in otherwise innocuous or discreet documents. They came with all the bells and whistles of communications between the Hartford and Morrison Mahoney, ones that should have been immediately recognizable to Mr. Aylward.

Finally, the "overriding interest of fairness and justice" dictates a waiver of the privilege. See Amgen, 190 F.R.D. at 293. The damage has already occurred. The Hartford's interests have been done a lasting disservice by Mr. Aylward's negligent disclosures. See, e.g., International Digital Systems Corp. v. Digital Equip. Corp., 120 F.R.D. 445 (D.Mass. 1988) ("there is no order I can enter which erases from defendant's counsel knowledge what has been disclosed."). It would only create an additional injustice "to reward such gross negligence by providing relief from waiver." Amgen, 190 F.R.D. at 293. Indeed, allowing Mr. Aylward to retrofit the disputed documents would produce no demonstrable benefit, while producing every incentive for Mr. Aylward to persist in the careless handling of the Hartford's communications. The interests of justice demand a rule that counsels diligence and accountability in the protection of the attorney-client privilege. See id. ("if the Court does not hold that a waiver has occurred under the egregious circumstances here presented, it might as well adopt the 'never waived' rule and preclude such holding in all cases.").

II.    The Hartford's Waiver Encompasses All Other Documents on the Same Subject

It is well established that inadvertent disclosures "can have a significance that transcends the documents actually disclosed." Texaco, 60 F.3d at 883. As recognized by the First Circuit, "[i]n general, a waiver premised on inadvertent disclosure will be deemed to encompass all other such communications on the same subject." Id. at 883-84 (internal citations omitted); see also Bowles, 224 F.R.D. at 257 ("a waiver of the attorney-client privilege for a document is not confined to that document alone, but extends to all other documents involving the same subject matter was well."). The Hartford's inadvertent disclosure of attorney-client communications involving the Hartford's denial letter should waive the privilege with respect to any other communications concerning the denial letter.

13

Subject matter waiver follows naturally from neglect of the attorney-client privilege. Once the privilege has been carelessly waived with respect to a particular subject matter, parties should not be permitted to reclaim and apply the privilege in patchwork fashion to cover up the balance of communications on the same subject matter. Not only is the usefulness of the patchwork privilege doubtful, it is potentially prejudicial to the receiving party who can thereafter be misled by the selective disclosure of attorney-client communications. To prevent the manipulation and distortion of the fact-finding process, whether intentionally or inadvertently by the disclosing party, the privilege should be removed and the entire subject matter brought to light.

This result especially recommends itself here. Aresty is not asking the Court to leverage one or two marginally relevant documents to strip the privilege from every conceivable attorney-client communication between the Hartford and its counsel. The inadvertently disclosed documents relate to the specific subject matter of the Hartford's denial letter, and this subject matter is undoubtedly critical to the litigation. Indeed, subject matter waiver would address severe and persistent deficiencies in the discovery process that the Hartford has yet proven willing or able to cure—namely, the identification of deponents capable of offering informed and cohesive testimony on the circumstances behind the creation and distribution of the Hartford's denial letter. Still without a Rule 30(b)(6) deponent, Aresty faces the daunting task of reconciling conflicting testimony about who initially proposed the denial letter and on what grounds, who communicated to Hartford's counsel the grounds of the denial, and who saw and ultimately authorized the denial letter. Compelling the production of documents relating to the subject matter of the denial letter would cure significant deficiencies in the Hartford's deposition testimony on this front.

14

Moreover, the relevant subject matter is sufficiently discrete that subject matter waiver would neither permit broad forays into, nor require the indiscriminate production of, opposing counsel's file. The scope of the subject matter is straightforward. Aresty would be seeking a limited and self-identifying universe of documents that concerned the December 2, 2003 denial letter and the circumstances of its creation and distribution; this universe would contain documents from a very narrow period of time, most likely embracing no more than several months; and would involve a very small group of authors and recipients. The Court could manage this production while minimizing the harm caused to Hartford by counsel's inadvertence. See, e.g., Texaco, 60 F.3d at 883 (compelling production of "complete administrative file" on basis of four inadvertently disclosed documents); In re Lernout & Hauspie Securities Litigation, 222 F.R.D. 29, 35 (D.Mass. 2004) (compelling production of fifteen emails on basis of one inadvertently disclosed email).

III.    Aresty Should be Permitted to Resume the Deposition of Mr. Perry Whether or Not the Court Finds a Waiver of the Attorney-Client Privilege

Finally, Aresty should be permitted to resume the deposition of Mr. Perry on the subject matter of his role in the Hartford's denial whether or not the Court finds a waiver of the attorney-client privilege. Should the Court find that the Hartford's inadvertent disclosures waives the attorney-client privilege, the issue is moot. Aresty would be permitted to depose Mr. Perry on the inadvertently disclosed documents pertaining to the denial letter and to all other documents embracing that subject matter. The scope of the waiver would embrace the subject matter for which Aresty seeks to resume the deposition of Mr. Perry.

Alternatively, if the Court determines that the Hartford's inadvertent disclosures do not waive the privilege, Aresty still possesses an independent basis for resuming the deposition of Mr. Perry. The Federal Rules give Aresty the right to depose a party for "one day of seven

15

hours." Fed.R.Civ.P. 30(d)(2). Nothing in the Rules requires that this time be used consecutively. Indeed, the Rule's provision for suspending and resuming depositions indicates that the "one day of seven hours" functions less as discrete unit of time and more as a window for concluding depositions. Aresty has deposed Mr. Perry for a little over three and half hours.[7] Aresty is thus permitted at least another three hours to conclude the deposition.

The Hartford attempts to deny Aresty this additional time by dictating the terms on which this time should be available to Aresty pending the Court's ruling on the privilege issue. Presumably, the basis of the Hartford's position is that Aresty has limited its ability to resume the deposition of Mr. Perry to the disputed documents for which it seeks a court order. Yet just because Aresty suspended the deposition of Mr. Perry so that it could seek a determination of the disputed documents—and so that it could ultimately probe deeper into Mr. Perry's involvement in the Hartford's denial as suggested by the disputed documents—does not mean that the Hartford can now limit the continuation of Mr. Perry's deposition to questions dealing specifically with the express content of the disputed documents. Not only would the boundary between questions dealing strictly with the express content of the disputed documents and those touching upon the documents' general subject matter prove nearly impossible to observe in practice, it would defeat the purpose of suspending Mr. Perry's deposition. Aresty suspended the deposition so that it could ultimately resume a more effective examination of Mr. Perry's involvement in the Hartford's denial. While using actual documentation of Mr. Perry's involvement is the most effective and efficient method of pursuing this examination, Aresty can, if required, pursue this examination by other means—now bolstered by the subsequent depositions of Mr. Perry's supervisors, which reveal that Mr. Perry, despite his deposition

---

[7] The deposition commenced at 1:10 to fit both counsel's schedules. The deposition was suspended at 4:55. Using the full seven hours consecutively would have placed impractical demands on all persons involved.

testimony, played a critical role in committing the Hartford to its decision to deny Aresty's claims.[8]

Even if the Court agrees that the continuation of Mr. Perry's deposition must be confined to the condition on which Aresty suspended it, the Rules allow Aresty to re-notice and re-depose a person who has already been deposed upon leave of court. Fed.R.Civ.P. 30(a)(2). Courts should generally grant leave to depose where required for a fair examination of the witness. See Christy v. Pennsylvania Turnpike Comm., 160 F.R.D. 51, 53 (E.D.Pa. 1995) ("a strong showing is required before a party will be denied the right to take a deposition.") (citing Deines v. Vermeer Mfg., 133 F.R.D. 46, 47 (D.Kan. 1990)). Fair examination of Mr. Perry demands that he be deposed on his involvement in the Hartford's decision to deny Aresty's claims. Such examination would not be unreasonably duplicative or burdensome because Mr. Perry has thus far deferred this line of inquiry to his supervisors, and in so doing has dramatically downplayed the extent to which the Hartford's decision to deny Aresty's claims rested on his involvement. The testimony of his supervisors, in turn, has only directed this line of inquiry back to Mr. Perry.[9] The continuation of Mr. Perry's deposition is therefore essential to closing this circle and

---

[8] The need to resume Mr. Perry's deposition is yet another consequence of the Hartford's failure to designate an adequate Rule 30(b)(6) deponent. When Aresty suspended the deposition of Mr. Perry, who disclaimed any significant role in the Hartford's denial, it did so on the belief that the Hartford would be designating someone who could testify to the Hartford's decision-making process. Of course, the net result of the Hartford's subsequent designations has been to pass the buck back to Mr. Perry.

[9] The circularity of this line of inquiry is astounding. It proceeds from Mr. Perry to his immediate supervisor Robert Percopo to Mr. Percopo's supervisor Sam Rizzitelli back to Mr. Perry. By the time it gets to Mr. Rizzitelli, Mr. Rizzitelli is quick to point out the extent to which he relied on Mr. Perry's decision-making:

    See Exhibit I, Deposition of John Perry at 17(19):
    Q: Did you have the authority in 2003 to deny coverage?
    A: No.
    Q: Who did?
    A: Bob Percopo.
    See id. at 138(2):
    Q: ...I think you testified earlier that you did not have authority to deny this claim correct?
    A: Correct
    Q: And that would have been Mr. Percopo, correct?
    A: Yes

17

finding *someone* who purports to have had some involvement in the decision-making process that led to the Hartford's denial. Indeed, Aresty would be willing to continue the deposition of Mr. Perry solely on the subject matter of his involvement in this process.

---

Q: Can you tell me whether or not Mr. Percopo or yourself received any opinion, written opinion from counsel, with respect to this claim?
A: I don't know if we did or not.
Q: Do you recall receiving a written opinion from counsel with respect to this claim?
A: I can't recall.
See Exhibit J, Deposition of Robert Percopo, at 72(24)-73:
Q: Now, were you the person who authorized Mr. Dugan to issue this [denial] letter?
A: Ultimately, I believe that decision was made by Sam Rizzitelli in home office.
See Exhibit K, Deposition of Sam Rizzitelli, at 48(21)-50:
Q: But did you feel at the time you authorized the denial that you had sufficient facts upon which to base the authorization?
A: I absolutely trusted John [Perry] and Bob [Percopo] and their assessment of the facts, but I also, out of curiosity, want to review the facts too.
Q: I think you testified earlier that you didn't have any discussions with either John or Bob about this.
A: I don't remember having discussions was testimony, I believe…
Q: Do you know whether the underwriter was put on risk alert?
A: I do not know whether or not that was followed through upon. I trust that John and Bob did that.
Q: But as you sit here today, you don't know whether that was done.
A: I do not know.
….
Q: Did you understand from this email that Mr. Perry would follow through on your inquiries regarding the rule of law and reporting requirements?
A: I believe that he followed through on all my instructions. I trust him to do that.
See id at 62(23)-63:
Q: So, you may have authorized the denial without knowing the basis?
A: I did know the basis, and the basis was in my email.
Q: Okay. And you just testified, though, that you don't know—you've never seen the documentation that's referenced there?
A: I did not see the documentation. I was trusting the analysis of John Perry.
See id at 80(22)-81:
Q: Do you know at the time you authorized the denial and rejection what the Hartford's position was with respect to the extent of extra expense loss sustained?
A: No I didn't. I did not—I did not go through every one of these statement of losses and compare them to what our attorney was doing when I approved the denial.
Q: You left that to him?
A: The denial basis was fraud.
Q: So you didn't have anything to do with the rejection of the proofs.
A: That's correct.
Q: That was –
A: It's within John Perry's authority.
Q: I'm sorry.
A: He would have reviewed this I would assume.
See id at 85(7):
Q: Can you tell from the documents that I showed you who authorized the response to the 93A letter?
A: John Perry. Most likely, I'm just guessing.

## CONCLUSION

For the foregoing reasons, the Court should find that the Hartford waived the attorney-client privilege through counsel's inadvertent disclosure of documents, that this waiver applies to both the actually disclosed documents and to all other documents relating to the same subject matter, and that this waiver allows Aresty to depose Mr. Perry as to the contents of the inadvertently disclosed documents. Alternatively, Aresty should be permitted to resume the deposition of Mr. Perry on the subject matter of the Hartford's denial, which was suspended pending the resolution of the inadvertent disclosures.

Respectfully submitted by

ARESTY INTERNATIONAL
LAW OFFICES, P.C.

By its attorneys,

James T. Hargrove (BBO# 550975)
Derek B. Domian (BBO# 660568)
Goulston & Storrs, P.C.
400 Atlantic Avenue
Boston, Massachusetts 02110-3333
(617) 482-1776

Date: July 15, 2005